## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **STEPHANIE BRITT,** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 1:19-CV-00781-RP** |
| | § | |
| **WALGREEN CO.,** | § | |
| | § | |
| **DEFENDANT**. | § | |
| | § | |

### DEFENDANT WALGREEN CO.'S PROPOSED FINDINGS
### OF FACT AND CONCLUSIONS OF LAW

Defendant Walgreen Co. ("Defendant" or "Walgreens") respectfully submits the following Proposed Findings of Fact and Conclusions of Law:

### I.  Proposed Findings of Fact (Liability)

#### A.  The Fall

1.        On September 22, 2017, Plaintiff entered a Walgreen's store in Kyle, Texas (hereinafter the "Store" or "Defendant's Store") at approximately 8:46 p.m. wearing flip-flops and no back brace. *See Plaintiff's Trial Exhibit 1*, Vol. 1, at 79:14-19. Plaintiff testified that she went to Defendant's Store with her mother and daughter to purchase a dental pick to finish her vinyl work. Vol. 1, at 40:5-23.

2.        According to Plaintiff's testimony, her mother and daughter went to go look for ice cream while she went in search of a dental pick. Vol. 1, at 40:5-23. At some point, Plaintiff went to go catch up with her mother and daughter. Vol. 1, at 40:24-41:5. While walking towards her family, Plaintiff testified that she was looking ahead and down the aisles—she was not looking at the floor for potential hazards. Vol. 1, at 83:2-8. Before she reached her family, Plaintiff slipped

267611700

on a clear liquid substance sometime between 8:46 p.m. and 9:10 p.m. on September 22, 2017. *See Plaintiff's Trial Exhibit 1 & 2*. Plaintiff admitted that she did not see anything on the floor before she fell. Vol. 1, at 83:2-8.

3.      There is no direct evidence establishing the source of the clear liquid substance on the ground—a fact that is wholly undisputed by the parties. Among other potential sources, there is surveillance video of an unidentified customer entering the Store and leaving with what appears to be a bag of ice in a grocery cart approximately 26 minutes before Plaintiff fell. *See Plaintiff's Trial Exhibit 1*. The video does not show the bag ripped, torn, or otherwise leaking. *Plaintiff's Trial Exhibits 1 & 26*. Indeed, there is no trail of water or ice cubes behind the cart and there was no evidence suggesting otherwise. *Id*.

4.      In addition, Miguel Arredondo, a former employee of Defendant, testified at trial and explained the policies maintained by Defendant as well as his observations the night of the fall. Vol. 2, at 16:16-17:1. Specifically, he testified that employees were trained to check the floors throughout the day to identify potential hazards. Vol. 2, at 18:13-19:16.  This testimony was also echoed by his co-workers Ashely Alexander and Brittny Whatley. *See Deposition Excerpts of Ashely Alexander Read at Trial,* at 10:1-8 & 28:7-16, attached here as Exhibit A; *Deposition Excerpts of Brittny Whatley Read at Trial*, at 8:1-20, attached here as Exhibit B.  Because the employees observed the condition of the floors throughout the day, there was no set schedule detailing specific times an employee needed to check the Store floor for potential hazards. *Id.* at 21:14-22:16. As Mr. Arredondo stated: "If I'm walking from point A to point B, I'm checking the floors." *Id.* at 22:7-8. In fact, this training was implemented so well that it became second nature for employees such as Mr. Arredondo. *Id.* at 19:12-23.

267611700

5.      On the night of the fall, Mr. Arredondo testified that he was the "floor person" and would have been in charge of cleaning bathrooms and taking out the trash. *Id.* at 22:21-25. He further stated that a few minutes before the fall he would have entered the stockroom to get trash bags to take out the trash. *Id.* at 23:20-24:2. The stockroom is located by the cooler doors where the fall occurred. *Id.* at 23:14-19. And, every time he went to the stockroom he "always look[ed] left and right" down the aisle where the cooler doors are. *Id.* at 24:3-10. Notably, Mr. Arredondo testified that he looked down the aisle where Plaintiff fell no more than ten minutes before the incident occurred and did not see any clear liquid substance, water, or ice cubes on the floor. *Id.* at 24:19-25:19.

6.      Mr. Arredondo also stated that cashiers looked out for damaged bags of ice, and, when he worked as a cashier and encountered a customer purchasing a ripped, torn, or leaking bag of ice he would offer them a new bag that was not damaged, or, if they insisted on purchasing the damaged bag, he would double bag the ice so that it would not spill anymore. *Id.* at 30:17-31:12. As is made clear in the surveillance video, the bag of ice was not double bagged. *See Plaintiff's Trial Exhibit 1*. Additionally, Mr. Arredondo did not recall any customer purchasing a ripped, torn, or leaking bag of ice and no cashier reported selling such a bag. Vol. 2, at 30:1-3 & 31:13-17.

7.      Finally, while Mr. Arredondo stated that, from time to time, a customer might pull out a damaged bag from the freezer leaving behind ice cubes, he does not believe that happened in this case.  Specifically, when Mr. Arredondo has seen a ripped, torn, or leaking bag removed from the freezer, it leaves ice or water in other parts of the store. *Id.* at 29:4-30:3. In this instance, he did not see or hear reports from others that ice or water was located in other parts of the store. *Id.*

## II.  <u>Conclusions of Law (Liability)</u>

### A.  Texas Law Requires Temporal Evidence in Slip and Fall Cases

8.  To establish her claim for premises liability, Plaintiff must prove four elements:

(1) the property owner had actual or constructive notice of the condition causing the injury;
(2) the condition posed an unreasonable risk of harm;
(3) the property owner failed to take reasonable care to reduce or eliminate the risk; and
(4) the property owner's failure to use reasonable care to reduce or eliminate the risk was the proximate cause of injuries to the invitee.

*McCarty v. Hillstone Rest. Group, Inc.*, 864 F.3d 354, 358 (5th Cir. 2017) (quoting *Henkel v. Norman*, 441 S.W.3d 249, 251-52 (Tex. 2014)).

9.  A threshold requirement in a premises liability case is that Plaintiff must show the landowner had actual or constructive notice of the premises defect. *See, e.g., Beavers v. Flying J Inc.*, 1:05-CV-244, 2006 WL 8440669, at *6 (E.D. Tex. May 25, 2006) (citing *Cadenhead v. Hatcher*, 13 S.W.3d 861, 864 (Tex. App.—Fort Worth 2000, no pet.) and *Richardson v. Wal-Mart Stores, Inc.*, 963 S.W.2d 162, 165 (Tex. App.—Texarkana 1998, no pet.)). In this case, it is undisputed that Defendant did not have actual notice of a clear liquid substance on the floor. As a result, Plaintiff must establish that Defendant had constructive notice.

10.  To establish a property owner's constructive notice of an unreasonable risk of harm, a Plaintiff must show that the hazardous condition existed for some definite length of time. *Wal-Mart Stores, Inc. v. Reece*, 81 S.W.3d 812, 815 (Tex. 2002). Texas adopted the "time-notice" rule because "temporal evidence best indicates whether the owner had a reasonable opportunity to discover and remedy a dangerous condition." *Id.* at 816. Indeed, proximity alone cannot establish constructive notice because it only indicates "that it was *possible* for the owner of the premises to discover the dangerous condition, not that the owner reasonably *should* have discovered it." *Pena v. Home Depot U.S.A., Inc.*, 32 F. Supp. 3d 792, 797 (S.D. Tex. 2013) (citing *Reece*, 81 S.W.3d at

4

816) (emphasis in original). "Without some temporal evidence, there is no basis upon which the factfinder can reasonably assess the opportunity the premises owner had to discover the dangerous condition." *Reece*, 81 S.W.3d at 816. Thus, when determining whether a defendant had constructive knowledge of a hazardous condition, the court must consider evidence of (1) longevity; (2) proximity, and (3) conspicuity. *Pena*, 32 F. Supp. 3d at 797 (citing *Reece*, 81 S.W.3d at 815-17). However, while these are all factors the Court must consider, there still must be "some proof of how long the hazard was there . . ." *Pena*, 32 F. Supp. 3d at 802 (citing *Reece*, 81 S.W.3d at 816).

### B. Plaintiff Cannot Meet Her Burden to Establish That Defendant Had Constructive Notice of the Clear Liquid Substance

#### i. *Plaintiff Has No Temporal Evidence (i.e. Longevity) Establishing How Long the Clear Liquid Substance Was Present Outside of Mere Speculation*

11.     At trial, Plaintiff attempted to establish constructive notice through the following circumstantial evidence: (1) an unidentified customer left the store with a bag of ice approximately 26 minutes before Plaintiff fell; (2) the clear liquid substance was seen in front of the ice freezer after the fall; (3) Defendant's employees knew that, from time to time, ice could fall out of torn or ripped bags[1]; (4) a Defendant's employee testified that the puddles were consistent with melted ice cubes; and (5) there is no evidence that the clear liquid substance came from anywhere else.

12.     At the outset, the surveillance video showing an unidentified customer leaving the store with a bag of ice is not a video from the aisle where Plaintiff allegedly fell. *Plaintiff's Trial Exhibits 1 & 26*. The area where Plaintiff allegedly fell was not under video surveillance, so no

---

[1] Plaintiff has continuously asserted that constructive notice exists because there is testimony that ice falls out of ripped or torn bags from time to time when the bag of ice is pulled out of the freezer. However, the mere fact that this happens from time to time does not establish that it happened on this particular occasion. In fact, the evidence before the Court clearly shows otherwise. Simply put, Plaintiff fails to demonstrate the necessary temporal evidence to establish liability.

video exists. *Plaintiff's Trial Exhibits 1 & 26*. Because of this, there is no video evidence showing the unidentified customer pulling out a bag of ice that was ripped or torn and dropping ice in the area where Plaintiff allegedly fell. In fact, the video evidence demonstrates just the opposite. *Plaintiff's Trial Exhibits 1 & 26*.

13.     Specifically, the bag of ice in the video is not ripped, torn, or leaking. *Id.* Also, the bag of ice in the video is not double bagged which, according to a defense witness, is the custom when a cashier notices a bag of ice is ripped, torn, or leaking. Vol. 2, at 30:17-31:12. Lastly, there is no evidence of ice or water trails throughout the store which would be expected if the bag was ripped, torn, or leaking. *Id.* at 29:4-30:3 & 31:13-17.

14.     In fact, Plaintiff's own testimony failed to provide the requisite temporal evidence. Specifically, she testified that she: (1) did not know what the liquid was; (2) did not see the liquid until she hit the floor; and (3) did not know how long the liquid was on the floor before she fell. Vol. 1, at 83:2-8; *see also Plaintiff's Deposition Transcript*, attached hereto as Exhibit C, at 207:11-14, 207:17-208:3, 209:12-19, and 209:25-210:3.

15.     Essentially, the only evidence related to longevity is that Plaintiff slipped on a clear liquid substance and that an unidentified individual may have purchased a bag of ice that, when pictured at the front entrance, is not double bagged, leaking water, or dropping ice cubes. In short, Plaintiff's entire case relies on the assumption that this bag of ice was the source of the clear liquid substance. That argument, however, is nothing more than pure speculation and is not supported by the evidence. Thus, the Court finds that Plaintiff wholly failed to provide the required temporal evidence as required by Texas law.

16.     Because the Court has determined that Plaintiff has not provided temporal evidence (i.e. failed to establish longevity) the Court does not need to analyze proximity and conspicuity.

267611700

Specifically, for either factor to be relevant to the Court's analysis, Plaintiff is required to offer some proof of how long the clear liquid substance was on the floor and where it came from. *See Reece*, 81 S.W.3d at 816 (noting that for proximity to be relevant "there must be some proof of how long the hazard was there before liability can be imposed" because, otherwise, "owners would face strict liability for any dangerous condition on their premises"); *Pena*, 32 F. Supp. 3d at 798 (rejecting conspicuity evidence where the plaintiff failed to establish how long the hazard had been on the floor or where it came from).[2]

17.     Here, as explained above, Plaintiff failed to meet her burden. As a result, the Court will issue a separate final order that Plaintiff take nothing by way of her suit and that Defendant shall recover its expenses and costs as permitted by Federal Rule of Civil Procedure 54(d).

## C. Defendant did Not Fail to Exercise Reasonable Care to Reduce or Eliminate the Risk

18.     Even assuming *arguendo*, that Defendant had constructive knowledge of the clear liquid substance, the Court finds that Defendant did not fail to exercise reasonable care to reduce or eliminate the risk.

19.     "The duty owed by an owner or occupier of premises to an invitee is not that of an insurer." *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 101 (Tex. 2000). "Thus, a defendant has 'no

---

[2] Even if the Court was required to analyze proximity and conspicuity, those factors would weigh in favor of Defendant. Specifically, Plaintiff presented no evidence that any of Defendant's employees were ever in close proximity to the clear liquid substance that Plaintiff allegedly fell on. In fact, Mr. Arredondo, who was the only employee somewhat near the freezer aisle, testified that approximately ten minutes before the fall he looked down the freezer aisle and saw no substance on the floor. Vol. 2, at 24:19-25:19; *see Pena*, 32 F. Supp. 3d at 798 (rejecting proximity evidence where the plaintiff had no evidence that any of the defendant's employees were in proximity to the hazardous condition before the plaintiff fell). Furthermore, Plaintiff's own testimony confirms that the clear liquid substance was not conspicuous. Indeed, she admitted that she did not see the clear liquid substance on the floor before she fell. Vol. 1, at 83:2-8; *see id.* at 799 (finding that a nine-inch puddle which was the same color as the floor was not conspicuous where the Plaintiff admitted she did not see the substance). In sum, even when considering all three prongs together the Court finds that Plaintiff's unsubstantiated speculative claims concerning longevity, proximity, and conspicuity of the clear liquid substance do not satisfy her burden of proof, and, therefore, do not demonstrate that Defendant had constructive notice of the substance.

267611700

duty' to take safety measures beyond those that an ordinary reasonable landowner would take." *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 204 (Tex. 2015).

20.     In this case, there was testimony that occasionally a customer would purchase a bag of ice that was ripped, torn, or otherwise leaking and ice (or water) would fall on the floor. Vol. 2, at 29:4-30:3. To counter this rare occurrence, the evidence showed that Defendant trained and required its employees to monitor the floor and clean up any spill they noticed. *Id.* at 21:14-22:16; *see also* Exhibit A, at 10:1-8 & 28:7-16; Exhibit B, at 8:1-20. Consistent with Walgreen's policy, Mr. Arredondo testified that he looked down the freezer aisle approximately ten minutes before Plaintiff fell and did not notice any clear liquid substance on the ground. Vol. 2, at 24:19-25:19.[3] Requiring any further precautions would essentially make Defendant the insurer of Plaintiff's safety, which, as noted above, is contrary to clear Texas case law. *See Brookshire Grocery Co. v. Taylor*, 222 S.W.3d 406, 408 (Tex. 2006) ("Otherwise, similar evidence could be used to show that the entire grocery store was unreasonably dangerous, since it is almost always the case that something more could have been done to prevent a customer from being struck by an article falling off a shelf or from slipping on the floor.").

21.     In sum, it is clear that Defendant took all precautions that an ordinary and reasonable storeowner would take, and that Defendant did not fail to exercise reasonable care to reduce or eliminate the risk. Thus, even assuming that Defendant had constructive notice, the Court

---

[3] Plaintiff argued at trial Defendant is somehow liable because it failed to place mats in front of the freezer section. Vol. 1, 12:18-20. However, Plaintiff produced no evidence from any expert witness that the floor's slip resistance inside of Defendant's store warranted using mats. *See Briley v. Wal-Mart Stores, Inc.,* No. 2:15-CV-439, 2018 WL 276368, at *7 (S.D. Tex. Jan. 3, 2018) ("Matters of slip resistance and surface friction are beyond the understanding and experience of the average lay citizen.") (cleaned up). Because this is a matter outside the knowledge of a lay individual and because Plaintiff failed to present expert testimony establishing the need for mats or other slip resistant material, the Court rejects Plaintiff's counsel's argument on this topic because it is not supported by any evidence and is merely argument of counsel. *See Oliveira v. Lynch*, 670 Fed. Appx. 307 (5th Cir. 2016) (stating that arguments of counsel do not constitute evidence); *Ex parte G.A.A.*, No. 04-20-00533-CV, 2021 WL 4066995, at *3 (Tex. App.— San Antonio Sept. 8, 2021, no pet.) (noting that "arguments of counsel is not evidence").

267611700

finds that Defendant is not liable for Plaintiff's injuries because it exercised reasonable care.

### D. Conclusion

22.     The Court finds that Plaintiff has not proven by a preponderance of the evidence that Defendant had constructive notice of the clear liquid substance. As a result, the Court will issue a separate final order that Plaintiff take nothing by way of her suit and that Defendant shall recover its expenses and costs as permitted by Federal Rule of Civil Procedure 54(d).

### E. Alternatively, Plaintiff Failed to Keep a Proper Lookout

23.     In the alternative, should the Court determine that Defendant had constructive notice of the clear liquid substance and failed to exercise reasonable care to reduce or eliminate the risk, Defendant offers the following proposed finding.

24.     Texas law follows proportionate responsibility. Under Texas Civil Practice and Remedies Code Section 33.003 the trier of fact is permitted to assign a percentage of responsibility to plaintiffs and defendants. If a Plaintiff's responsibility exceeds 50%, they may not recover damages for their claims. TEX. CIV. PRAC. & REM. CODE § 33.001.

25.     In this case, Plaintiff had a duty to keep a proper lookout while walking in Defendant's Store. Indeed, "[i]t s a cardinal rule of law that a person is required to make reasonable use of his faculties of sight, hearing, and intelligence to discover dangers and conditions of danger to which he is, or might become, exposed, and one injured as a result of his failure to use his faculties to observe and discover a danger which would have been observed and discovered by an ordinarily prudent person is guilty of contributory negligence." *U.S. Gypsum Co. v. Balfanz*, 193 F.2d 1, 4 (5th Cir. 1951); *see also Quintanilla v. Tuma's Estate*, 579 S.W.2d 531, 533 (Tex. Civ. App.—San Antonio 1979, writ ref'd n.r.e.) ("Although [plaintiff] was not required to anticipate negligent and unlawful conduct on the part of others, he was not entitled to close his eyes to that

which would have been observed by a person of ordinary prudence in a similar situation."); *Patino v. Furr's Supermarkets*, 512 S.W.2d 54, 56 (Tex. Civ. App.—El Paso 1974, writ ref'd n.r.e.) (noting that a plaintiff had a duty to exercise ordinary care to prevent injury to himself, including, keeping a proper lookout while walking in the defendant's store).

26.     The Court determines that Plaintiff failed to keep a proper lookout while walking in Defendant's Store. Specifically, she admitted that she was not looking at the floor for potential hazards while she was walking towards her family and testified that she never saw the clear liquid substance before she fell. Vol. 1, at 83:2-8. In addition, Plaintiff visited the store wearing flip-flops despite knowing that she was suffering from chronic back issues. *Id.* at 79:18-19.

27.     Pursuant to Texas Civil Practice and Remedies Code Section 33.003, the Court assigns Plaintiff 51% fault and Defendant 49% fault for the accident at issue. Thus, as Plaintiff has been assigned greater than 50% fault, she may not recover damages in this suit. As a result, the Court will issue a separate final order that Plaintiff take nothing by way of her suit and that Defendant shall recover its expenses and costs as permitted by Federal Rule of Civil Procedure 54(d).

### III. Proposed Findings of Fact (Damages)

28.     Defendant believes that Plaintiff has failed to prove her liability case. As a result, Defendant believes that Plaintiff is not entitled to damages, that a defense verdict should be granted, and that a take-nothing judgment against Plaintiff should be entered with costs and expenses awarded to Defendant as allowed by Federal Rule of Civil Procedure 54(d). Nonetheless, in the event the Court disagrees, Defendant provides alternative findings of fact regarding Plaintiff's damages claims.

### A. Plaintiff Has a Long History of Back Pain and Several Reported Falls Preceding the Incident at Defendant's Store

29.     In December of 2011, Plaintiff slipped in her shower and fell on her tailbone causing her to visit the emergency room. Vol. 1, 59:4-22 & 77:1-13. Plaintiff first injured her back in 2012 when she was moving a car seat and felt popping in her back-causing pain so severe that she was forced to visit the emergency room. Vol. 1, 57:20-58:6. In fact, Plaintiff testified that the 2012 back injury was the most painful thing that she had ever been through. *Id.* at 58:12-20. Her pain persisted from 2012 to 2016 and prevented her from working. *Id.* 58:21-25. Plaintiff described herself as being in "very bad shape" during this timeframe. *Id.*

30.     Notably, in April of 2016 Plaintiff visited an emergency room in Kyle, Texas complaining of low back pain as well as left leg pain, which, is the same left leg in which she complained of pain after her fall at Defendant's Store. *Id.* at 60:9-61:2. She was then transferred to Seton Hays in Kyle to see a neurologist, Dr. Motiva Misra. Dr. Misra performed an MRI of Plaintiff and determined that her back and left leg pain were chronic in nature and "out of proportion to the MRI findings." *Id.* at 62:9-64:21. In addition, Dr. Misra noted that Plaintiff's left leg weakness was not explained by the MRI. *Id.* Similarly, in September of 2016, Plaintiff visited Dr. Wang and complained of low back pain and left leg pain limiting her ability to walk long distances. *Id.* at 65:1-66:2.

31.     On January 5, 2017, about eight months before the incident made the basis of this lawsuit, Plaintiff fell in her garage causing severe low back pain for which she visited the emergency room. *Id.* at 66:3-67:6. And, again, on January 17, 2017, Plaintiff visited the Kyle emergency room due to sudden "hot poker" pain in her low back. *Id.* at 68:16-69:12. The next day Dr. Wang performed an MRI and noted in his records that her degree of pain was out of proportion to the radiographic findings. *Id.* at 70:18-71:19.

32.     Further, Dr. Wang noted that a discectomy would not relieve her symptoms, and, therefore, he did not recommended surgery. *Id.* at 71:24-72:21. Regardless, in March of 2017, Plaintiff underwent a decompression with discectomy at the L5-S1 level performed by Dr. Garza— i.e. the same surgery that Dr. Wang would not perform. *Id.* at 74:5-8. On September 18, 2017, Plaintiff followed up with Dr. Garza and reported "new left leg pain symptoms that radiate toward her foot." *Id.* at 89:19-90:9.

### B.  Medical Treatment After the Fall

33.     After the fall on September 22, 2017, Plaintiff was transported to the emergency room by ambulance. *Id.* at 87:18-20. Upon arrival, Plaintiff complained of left leg pain, which, is the exact same pain she complained about to Dr. Garza before and after her surgery. *Id.* at 88:18-24. Interestingly, Plaintiff did not visit Dr. Garza until two months after the fall on November 27, 2017. *Id.* at 90:20-91:3. Moreover, between September of 2017 and November of 2017 Plaintiff visited the emergency room on three separate occasions and never mentioned back pain or the fall at Defendant's Store. *Id.* at 91:22-92:4. She received no other medical treatment for her back during this two-month time frame. *Id.* at 88:25-89:18.

34.     Two years later on November 15, 2019, Plaintiff visited Dr. Frank Kuwamura for the first time for her lower back pain. *See Excerpts of Dr. Kuwamura's Deposition Utilized at Trial*, attached hereto as Exhibit D, at 131:10-16. At this visit he ordered an MRI of Plaintiff's lumbar spine. Vol. 1, at 97:15-23. On January 23, 2020, Plaintiff followed up with Dr. Kuwamura to discuss her MRI. *Id.* During this visit, which was only the second time Plaintiff ever saw Dr. Kuwamura, he recommended and scheduled an anterior lumbar interbody fusion at the L4-L5 and L5-S1 levels which Plaintiff received on February 10, 2020. *See Plaintiff's Trial Exhibit 5.*

### C. Plaintiff's Pain and Suffering/Mental Health

35. On February 16, 2018, about five months after Plaintiff's fall at Defendant's Store, Plaintiff visited Dr. Garza and filled out a patient health questionnaire that contained questions related to her mental health. Vol. 1, at 92:17-93:13. In response to a question that asked whether Plaintiff had little interest or pleasure in doing things, Plaintiff responded "not at all." *Id.* In addition, in response to a question that asked whether Plaintiff was feeling down, depressed, or hopeless, Plaintiff responded "not at all." *Id.*

36. Further, Plaintiff's husband, Charles Britt, testified at trial that her mental health was great, her emotional health was great, that she was getting better every day, and that the surgery with Dr. Kuwamura gave her a little life back. *Id.* at 145:25-146:11. Finally, Plaintiff has not seen any psychiatrists or counselors for any alleged mental health issues. *Id.* at 99:18-21.

## IV. Conclusions of Law (Damages)

37. As noted above, Defendant believes that Plaintiff failed to prove her liability case. As a result, Defendant believes that Plaintiff is not entitled to damages, that a defense verdict should be granted, and that a take-nothing judgment against Plaintiff should be entered with expenses and costs awarded to Defendant as allowed by Federal Rule of Civil Procedure 54(d). Nonetheless, in the event the Court disagrees, Defendant provides alternative conclusions of law regarding Plaintiff's damages claims.

### A. In the Alternative, the Fall Did Not Proximately Cause Plaintiff's Injuries

38. In the alternative, and assuming *arguendo* that the Court determines that Defendant did have constructive notice of the clear liquid substance, Plaintiff also failed to demonstrate that the fall proximately caused her injuries. *See McCarty*, 864 F.3d at 358 (noting that a plaintiff in a

premises liability case must prove that the property owner's failure to use reasonable care to reduce or eliminate the risk was the proximate cause of injuries to the invitee).

39.     At the outset, Plaintiff's own treating physician, Dr. Garza, did not state that the accident was the sole cause of Plaintiff's anterior lumbar interbody fusion. Instead, Dr. Garza's trial testimony shared three potential theories regarding Plaintiff's need for the second surgery: (1) Dr. Garza's surgery was inadequate; (2) Dr. Garza's surgery was adequate, but, a small disc herniation remained; or (3) it was a new herniation caused by the fall. *See Excerpts of Dr. Garza's Deposition Utilized at Trial*, attached hereto as Exhibit E, at 82:23-85:6 & 85:16-86:24. Although Dr. Garza shared these three potential theories, he was unable, at least based on the objective data, to opine whether the fall caused a new herniation requiring surgery. *Id.*

40.     In contrast to Dr. Garza's uncertainty regarding the fall causing anatomical changes to Plaintiff's spine, Dr. Adewale Adeniran, an orthopedic spine surgeon, opined that the slip and fall did not cause anatomical changes to her spine. Vol. 2, at 51:5-53:8 & 54:10-14. In fact, Dr. Adeniran further opined that with no anatomical changes and evidence of only degenerative disc disease, the surgery performed by Dr. Kuwamura could not be related to the fall. *Id.* Specifically, Dr. Adeniran based his opinions on three studies: (1) the CT Scan done immediately after the accident; (2) a nerve conduction study; and (3) flexion X-rays of Plaintiff's lumbar spine.

41.     First, the records indicated that Plaintiff received a CT scan after she was taken to the emergency room on September 22, 2017. Vol 2., at 51:5-52:24. According to Dr. Adeniran, this CT scan did not demonstrate an acute bone abnormality in Plaintiff's spine; instead, it showed chronic degenerative changes in her lumbar spine. *Id.* at 51:5-53:8 & 54:10-14. Thus, Dr. Adeniran opined that the CT scan demonstrated that the fall did not cause any new structural problems with Plaintiff's spine. *Id.*

42.     Next, Dr. Adeniran focused on a nerve conduction study performed on Plaintiff. *Id*. at 54:20-57:12. He explained that a nerve conduction study helps determine whether an individual's nerves are working correctly, or, whether they are damaged. *Id.* In this case, Plaintiff underwent a nerve conduction study on September 19, 2018, which came back normal. *Id.* With a normal finding, Dr. Adeniran opined that there was no new medical problem with the nerve on Plaintiff's left side; therefore, the fall could not have been the cause of Plaintiff's left leg pain. *Id.*

43.     Finally, Dr. Adeniran reviewed flexion and extension X-rays that Plaintiff had in September of 2019. *Id.* at 58:4-58:24, 59:10-15, & 59:19-61:19. These X-rays can reveal instability which is often referred to as spondylolistheses—a condition causing your back to shift forward and backwards. *Id.* As Dr. Adeniran testified, the best indication that a fusion surgery is necessary is when there is instability of the spine. *Id.* In this case, the flexion and extension X-rays revealed that Plaintiff did not have any instability in her spine; therefore, the only plausible reason for performing the fusion would be for degenerative disc disease which cannot be caused by the fall. *Id.* at 61:6-23. As a result, Dr. Adeniran testified that the fusion surgery could not be reasonably based on the fall at Defendant's Store. *Id.* at 62:3-14.

44.     In addition, Dr. Warren F. Neely, a board-certified neurosurgeon, also testified that the fall on September 22, 2017 did not cause a need for surgery. *Id.* at 83:16-88:3, 88:14-95:18, & 97:3-98:8.  Dr. Neely, after reviewing all of Plaintiff's pre and post-accident MRIs, opined that Plaintiff's complaints were the result of degenerative disc disease and not traumatic injury related to the fall.  *Id.* Further, he noted advanced degenerative changes at the L3-4, L4-5, and L5-S1. All of these spinal segments often lead to chronic back pain—which, not surprisingly, is a condition Plaintiff began having as early as 2012. *Id.* at 98:9-24; Vol. 1, at 57:23-58:6.

267611700

45. In forming their opinions, Dr. Adeniran and Dr. Neely both relied on pre and post-accident MRIs and medical records of Plaintiff from 2012 to present. Vol. 2, at 48:15-49:22, 82:25-83:8 & 83:16-84:6. This is significant because Dr. Kuwamura, the doctor who performed Plaintiff's fusion, attributed the need for this surgery to Plaintiff's fall at Defendant's store even though he never reviewed Plaintiff's pre-accident medical records or pre-accident MRIs. Exhibit D, at 82:24-83:14, 84:21-85:4, 85:21-86:2, 94:2-10, 97:6-13, 104:21-105:14, 111:23-112:12, 121:10-22, 124:10-22, 172:15-173:4, 174:13-19 & 177:10-19. As a result, Dr. Kuwamura did not have an opportunity to compare Plaintiff's pre-accident spine condition with Plaintiff's post-accident spine condition like Dr. Adeniran and Dr. Neely.

46. This is critical. Analyzing prior medical tests allows a surgeon to have a complete picture of a patient's medical history. With a before and after picture, the surgeon can more accurately determine whether a recommended surgery can be attributed to a fall or an established pre-existing condition. Vol. 2, at 48:15-49:22, 82:25-83:8 & 83:16-84:6. Because it is undisputed that Dr. Kuwamura failed to review pre-accident medical records, it is clear that he was not familiar with Plaintiff's pre-accident spine condition or how the fall affected Plaintiff's spine, if at all. Exhibit D, at 82:24-83:14, 84:21-85:4, 85:21-86:2, 94:2-10, 97:6-13, 104:21-105:14, 111:23-112:12, 121:10-22, 124:10-22, 172:15-173:4, 174:13-19 & 177:10-19. This is in stark contrast to Dr. Adeniran and Dr. Neely who both had a complete set of before and after medical records related to Plaintiff's spinal condition. Vol. 2, at 48:15-49:22, 82:25-83:8 & 83:16-84:6.

47. Moreover, Dr. Kuwamura is biased. Specifically, Dr. Kuwamura has a direct and indirect financial interest in this litigation. As Dr. Kuwamura testified, he does not get paid unless Plaintiff wins. *See Deposition Excerpts of Dr. Kuwamura Played by Plaintiff at Trial*, attached hereto as Exhibit F, at 39:16-24. Also, Dr. Kuwamura testified that at the time Plaintiff had

surgery, his now wife owned DC Medical—the company that provided surgical hardware for Plaintiff's surgery. Exhibit D, at 81:4-81:7. The combined financial interest Dr. Kuwamura stands to lose or gain in this matter totals over $720,000.00.

48.     Based on the facts referenced above, the Court finds that Dr. Kuwamura's medical causation testimony linking the fall to Plaintiff's alleged personal injuries and need for anterior lumbar interbody fusion lacks credibility and is weighed accordingly. The Court finds that the testimony and opinions of Dr. Adeniran and Dr. Neely were credible and should be given greater weight. Specifically, Dr. Adeniran and Dr. Neely's opinion that the fall on September 22, 2017 did not cause a need for the surgery performed by Dr. Kuwamura was supported by a complete, as opposed to an incomplete, examination of Plaintiff's entire medical history and the condition of Plaintiff's spine before and after the fall.

49.     Dr. Kuwamura also testified that due to the two-level anterior lumbar interbody fusion he performed, Plaintiff will require a fusion at the L3-L4 level in the future. Vol. 2, at 62:15-63:8. However, because the Court determined that the two-level fusion was not caused by the fall, the Court also finds that the future surgery would be unrelated. This finding is supported by the testimony and opinions of Dr. Adeniran and Dr. Neely who both testified at trial that because the two-level fusion was not related to the fall, any future surgery would likewise be unrelated. Vol. 2, at 63:10-15 & 107:5-11.

50.     In sum, the Court finds that Defendant did not proximately cause Plaintiff's injuries. As a result, the Court will issue a separate final order that Plaintiff take nothing by way of her suit and that Defendant shall recover its expenses and costs as permitted by Federal Rule of Civil Procedure 54(d).

**B. Further In the Alternative, Plaintiff's Requested Damages are Grossly Inflated**

51.     Defendant believes that Plaintiff has not proven her liability case.  As a result, Defendant believes that Plaintiff is not entitled to damages, that a defense verdict should be granted, and that a take-nothing judgment against Plaintiff should be entered with expenses and costs awarded to Defendant. Nonetheless, in the event the Court disagrees, Defendant provides alternative findings regarding Plaintiff's requested damages.

*i.     Medical Costs in the Past*

52.     Texas law is clear that a plaintiff in a personal injury lawsuit can only recover damages for past medical expenses to the extent those expenses are reasonable. *See In re K & L Auto Crushers, LLC*, 627 S.W.3d 239, 249 (Tex. 2021), *reh'g denied* (Sept. 3, 2021) ("It has long been well-settled that 'recovery of [medical] expenses will be denied in the absence of evidence showing that the charges are reasonable . . .'") (*citing Dallas Ry. & Terminal Co. v. Gossett*, 156 Tex. 252, 259, 294 S.W.2d 377, 383 (1956)). In fact, the Texas Supreme Court recently addressed the question of whether medical expenses needed to be reasonable to be recoverable or if proving they were paid or incurred was enough.  The Texas Supreme Court explained:

> We disagree. Section 41.0105 limits a claimant's recovery from a tortfeasor to the amount of medical expenses the claimant actually paid or incurred, meaning the amount the claimant's provider has a legal right to be paid . . . But section 41.0105 is not the only limit on a claimant's recovery of medical expenses. In fact, it expressly imposes the paid or incurred limitation in addition to any other limitation under law. One such other limitation is the common law requirement that the amount of recoverable expenses be reasonable . . . The enactment of section 41.0105 did not eliminate this common law limitation; instead, it expressly imposed the paid or incurred limitation in addition to the reasonableness limitation.

*In re K & L Auto Crushers, LLC*, 627 S.W.3d at 249 (internal citations and quotations omitted); *see also Cornejo v. EMJB, Inc.*, SA-19-CV-01265-ESC, 2021 WL 4526703, at *12 (W.D. Tex. Oct. 4, 2021) ("Plaintiffs may only recover those expenses determined to be reasonable, and proof

of the amount charged does not in itself constitute evidence of reasonableness.") (internal citations and quotations omitted).

53.     In this case, Dr. Kuwamura charged Plaintiff $351,306.54 for her anterior lumbar interbody fusion. Vol. 1, at 56:3-5; *see also Plaintiff's Trial Exhibit 5*. However, Dr. Neely testified at trial that a reasonable charge for that surgery is $69,200.00. Vol. 2, at 98:25-99:18. Furthermore, Dr. Garza testified that a reasonable range for the surgery could be between $65,000.00-$100,000.00. Exhibit E, at 121:23-122:7.

54.     Based on the testimony of Dr. Garza, Dr. Neely, and Dr. Kuwamura, and considering Dr. Kuwamura's financial interest in this lawsuit, the Court finds that Dr. Kuwamura's charges are not reasonable and, instead, determines that the charges presented by the testimony of Dr. Neely are reasonable. *See In re K & L Auto Crushers, LLC*, 627 S.W.3d at 249 ("[if] a claimant agrees or is required to pay a medical provider more than a reasonable amount, the difference between the amount paid and a reasonable amount is not a necessary and usual result of the tortious act, but of the claimant's or provider's conduct.").

55.     Thus, assuming that Defendant proximately caused the alleged personal injuries requiring the need for Plaintiff's anterior lumbar interbody fusion, the Court finds Plaintiff is entitled to $69,200.00, the reasonable charge for that surgery.

### ii.     Medical Costs in the Future

56.     To recover for future medical expenses, Plaintiff must show there is a reasonable probability that expenses resulting from the injuries she sustained in the fall will be necessary in the future. *See Pilgrim's Pride Corp. v. Cernat*, 205 S.W.3d 110, 121 (Tex. App.—Texarkana 2006, pet. denied). To make this showing, Plaintiff must provide evidence of: (1) a reasonable probability that she will incur future medical expenses, and (2) the reasonably probable amount of

the future medical expenses. *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). The factfinder may decide the amount of future medical expenses based on: (1) the injuries suffered; (2) the medical care rendered before trial; (3) the injured party's progress toward recovery under the treatment received; and (4) the condition of the injured party at trial. *Id.*

57.     Dr. Kuwamura testified that as a result of the anterior lumbar interbody fusion Plaintiff would, more likely than not, be required to undergo a one level fusion at the L3-L4 level in the future. Dr. Kuwamura also testified that this one level fusion would cost $370,758.00. *See Plaintiff's Trial Exhibit 5.*

58.     On the other hand, Dr. Neely testified that the reasonable rate for this surgery would be approximately $69,200.00, though it could be less because it is only a one-level fusion as opposed to a two-level fusion. Vol. 2, at 106:15-107:11. Similarly, Dr. Garza, Plaintiff's own treating physician and testifying expert, testified that the L3-L4 fusion could cost between $40,000.00 and $75,000.00. Exhibit E, at 125:6-125:13.

59.     The Court does not find Dr. Kuwamura's testimony credible as it relates to the cost of the one-level fusion in the future. First, and as noted above, Dr. Kuwamura has a direct financial interest in this litigation making his testimony regarding medical costs less credible. Furthermore, the future surgery is less complex and less time consuming than the two-level fusion previously performed by Dr. Kuwamura. Despite this, Dr. Kuwamura claims that the future surgery is approximately $20,000.00 more than the first surgery he performed. This does not make financial sense.

60. In sum, if Plaintiff requires a one level fusion at the L3-L4 level in the future that is proximately caused by the fall, the Court finds the reasonable cost to be $69,200.00, which is the amount of damages Plaintiff is entitled to for future medical treatment in this case.

### iii. *Loss of Earning Capacity in the Past and Future*

61. Plaintiff also seeks damages for loss of earning capacity alleging she is unable to work the remainder of her life due to the alleged accident. Plaintiff, however, has not held a full-time job since 2006 and has not applied for a job since 2003. Vol. 1, at 30:5-9. Further, during the time period of January 2018, a time when Plaintiff's expert opined that Plaintiff was prevented from returning to work due to the accident, Plaintiff had not applied for a job or had any job prospects lined up. *Id.* at 128:7-9 & 128:12-21.

62. At trial, Robert Cox, a vocational rehabilitation counselor, testified regarding Plaintiff's capacity to work. Vol. 2, at 112:21-23. In forming his opinion, Mr. Cox relied upon Plaintiff's work history, reviewed all medical records to determine whether there were any existing medical restrictions, and spoke to Plaintiff via Zoom. *Id.* at 114:23-116:20.

63. According to Mr. Cox, he concluded that Plaintiff could return to work in a sedentary position. *Id.* at 116:25-117:23. Specifically, Mr. Cox based his opinion on the following facts: (1) Plaintiff sat through her six-hour deposition with no obvious pain; (2) Mr. Cox interviewed Plaintiff on Zoom where he was able to observe and talk with Plaintiff; (3) based on his Zoom interview, Mr. Cox believed that Plaintiff was physically and mentally able to perform sedentary work; and (4) Plaintiff did not have any medical restrictions preventing her from working. *Id.* at 116:25-117:23 & 120:7-9. In Mr. Cox's opinion, Plaintiff could have returned to work in January of 2019, and, after her surgery with Dr. Kuwamura she could have returned to work as of August 2020. *Id.* at 118:8-120:9.

64. Thus, Mr. Cox believed that Plaintiff's loss of earning capacity in the past should be based on the time that she was prevented from working due to her surgery with Dr. Kuwamura. *Id.* at 120:21-121:5. Dr. Horner, an expert economist, valued this time at $23,518.00. *Id.* at 120:21-121:5 & 137:10-18. Further, in Mr. Cox's opinion, Plaintiff did not suffer a future loss of earning capacity because she was able to return to work in a sedentary capacity, which is similar to the last job she held in 2006. *Id.* at 120:10-20.

65. In sum, the Court concludes that Plaintiff suffered a loss of earning capacity in the past of $23,518.00 and further concludes that Plaintiff did not suffer a loss of earning capacity in the future.

### iv. *Alternative: Loss of Earning Capacity in the Past and Future*

66. Alternatively, if the Court determines that Plaintiff will never be able to hold a job in the future, which Defendant disputes, Defendant offers the following conclusion of law.

67. At trial, Plaintiff's economic expert, Marcus Reading, testified that if Plaintiff is never able to return to work, then she will suffer damages in the range of $319,505.00 to $940,685.00. Vol. 1, at 136:11-25. Mr. Reading testified that he had no wage-earning history for Plaintiff when he created this damages range. *Id.* at 138:8-11.

68. This range is based on three scenarios regarding jobs that Mr. Stinson (Plaintiff's vocational rehabilitation expert) believes she could have held but for this accident. Vol. 1, at 136:11-25. The low end assumes that Plaintiff would earn minimum wage and the high end assumes that she was doing work as a procurement clerk. *Id.*

69. However, there is one significant problem with Mr. Reading's damages range. Specifically, Mr. Reading calculated his figures by assuming that Plaintiff would work until age

65 simply because she told him that she would have worked until retirement age. *Id.* at 138:16-139:11. He did not rely on any statistical work life expectancy table. *Id.*

70.     However, as Dr. Stephen Horner explained, Mr. Reading's testimony was unreliable because his analysis relied on Plaintiff's subjective statement that she intended to work until 65. Vol. 2, at 130:15-22 & 131:1-21. Dr. Horner, using reliable work life expectancy tables, determined that Plaintiff's work life-expectancy was 22.45 years. Dr. Horner thoroughly explained the methodology of the work life expectancy tables and the Court finds them to be reliable. *Id.* at 132:4-134:19. Specifically, the Court finds a carefully developed statistical study is a more accurate representation of an individual's ability to work as opposed to their subjective opinion that they want to work until retirement age. Thus, when considering the appropriate work life expectancy, Mr. Reading's damage range is reduced to $206,150.00-$582,691.00. *Id.* at 136:18-137:9.

71.     The Court finds the low end of Mr. Reading's damage range, i.e. assuming Plaintiff would have earned minimum wage, is appropriate because Plaintiff presented no wage-earning history in this case, and, therefore presented no evidence to assume that she would earn higher than minimum wage. Thus, this Court concludes in the alternative that Plaintiff is entitled to $206,150.00 for her claim of loss of earning capacity.

### v.     *Non-Economic Damages*

72.     At trial, Plaintiff's counsel stated that he is seeking $7.5 million in noneconomic damages. Vol. 1, 18:8-11. The Court does not believe that Plaintiff has presented evidence sufficient to sustain such award.[4]

---

[4] The below areas of recovery for non-economic damages are the damages set forth in Plaintiff's First Amended Petition. These are the only non-economic damages that Plaintiff is entitled to recover because these are the only non-economic damages for which Plaintiff plead in her live complaint.

## 1. Mental Anguish and Pain and Suffering

73.     "The term 'mental anguish' implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). Pain and suffering damages may be awarded for physical pain (as opposed to mental pain) actually experienced by the plaintiff in the past, or physical pain the plaintiff will in reasonable probability experience in the future. *See, e.g., PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 517 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

74.     Here, Plaintiff's claim for mental anguish damages is diminished by the fact that she indicated on a patient questionnaire in February of 2018 that she was not feeling down, depressed, or hopeless. Vol. 1, at 92:17-93:12. Additionally, Plaintiff has not seen any psychiatrists or counselors for any alleged mental health issues. *Id.* at 99:18-21. Finally, her husband testified that at the time of trial her mental health was great, her emotional health was great, that she was getting better every day, and that the surgery with Dr. Kuwamura gave her a little life back. *Id.* at 145:25-146:11. In the Court's opinion, all of these facts weigh against finding that she has suffered severe mental anguish in the past or future.

75.     As it relates to pain and suffering, the Court notes that while Plaintiff testified that she was in pain, she inexplicably waited two months to go see Dr. Garza, her surgeon, after the fall. And, during the two months after the fall, she visited the emergency room on multiple occasions and never mentioned that she was suffering from back pain. Vol. 1, at 88:25-89:18 & 91:17-92:4.

76.     Based on the evidence presented, the Court finds that an award of _____ would fairly compensate Plaintiff for her past mental anguish and pain and suffering damages and an award of _____ would fairly compensate future mental anguish and pain and suffering damages.[5]

### 2. Disability (Physical Impairment)

77.     Physical impairment encompasses the loss of the injured party's former lifestyle. *Dawson v. Briggs*, 107 S.W.3d 739, 752 (Tex. App.—Fort Worth 2003, no pet.). While Plaintiff did explain the effect the fall had on her ability to perform up to her former lifestyle, her husband did note that she was doing much better, doing much more on her own, and getting closer to where she was before the fall. *Id.* at 145:25-146:11.

78.     Thus, based on the evidence presented, the Court finds that an award of _____ would fairly compensate Plaintiff for her past physical impairment damages and an award of _____ would fairly compensate her for her future physical impairment damages.

### C. Conclusion

79.     Defendant believes that Plaintiff has not proven her liability case. As a result, Defendant believes that Plaintiff is not entitled to damages, that a defense verdict should be granted, and that a take-nothing judgment against Plaintiff should be entered with expenses and costs awarded to Defendant. Nonetheless, in the event the Court disagrees, Defendant provides alternative findings regarding Plaintiff's requested damages.

80.     Based on the findings of fact and conclusions of law, the Court finds that the accident at issue proximately caused injuries to Plaintiff, resulting in both economic and non-economic damages.

---

[5] Mental anguish and pain and suffering are combined as presented in the Texas Pattern Jury Instructions. *See* Texas PJC 28.3 (2018).

81.     Accordingly, the Court awards the following damages to Plaintiff:

| | |
|---|---|
| Past medical expenses | $69,200.00 |
| Future medical expenses | $69,200.00 |
| Loss of Earning Capacity in the Past | $23,518.00 |
| Loss of Earning Capacity in the Future | $0.00 |
| Past mental anguish and pain and suffering | $ |
| Future mental anguish and pain and suffering | $ |
| Past impairment | $ |
| Future impairment | $ |
| **Total** | **$** |

82.     A final judgement will be entered separately.


SIGNED on _____.


                                    _____
                                    THE HON. ROBERT PITMAN
                                    UNITED STATES DISTRICT JUDGE

267611700

Respectfully Submitted,

**CLARK HILL, PLC**
2301 Broadway
San Antonio, Texas 78215
Telephone (210) 250-6000
Facsimile (210) 250-6100

By: ___*/s/ Stephen T. Dennis*___
      **STEPHEN T. DENNIS**
      Texas Bar No. 24040795
      sdennis@clarkhill.com
      **CYNTHIA DAY GRIMES**
      Texas Bar No. 11436600
      cgrimes@clarkhill.com
      **CHARLES HAYES**
      Texas Bar No. 24116496
      chayes@clarkhill.com

**ATTORNEYS FOR DEFENDANT
WALGREEN CO.**

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on the 21st day of June, 2022, a true and correct copy of the foregoing was forwarded to all known counsel via the Court's CM/ECF system in compliance with the Federal Rules of Civil Procedure.


*/s/ Stephen T. Dennis*___
Stephen T. Dennis

267611700